## GARY, In re.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 25025. Decided May 27, 1960.

George V. Johnson, for plaintiff-appellee.
Stanley E. Tolliver, for defendant-appellant.

## OPINION

By SKEEL, J.

This appeal comes to this court on questions of law from a judgment entered for the relator after trial in the Court of Common Pleas of Cuyahoga County. The action is in Habeas Corpus. The relator is the mother of Charles Alfred Gary, an infant, now about four years of age. The respondent was the wife of Andy Gary, now deceased, who was the brother of the relator. The child was born in Hayneville, Alabama. Shortly after the birth of the child, Andy Gary (the uncle) and his wife, Louie Gary (respondent) visited the home of the relator in Alabama, and with the consent of the mother, took possession of the child and has ever since that day retained his physical custody.

Some claim that the relator "gave" the child to her deceased brother (which fact, even if so, would give the respondent no legal advantage in this action) was completely denied by the relator when she testified:

"Q. Now, this child, without going into a lot of technicalities, did you give your brother possession of this child?

"A. No, not—no. He came to me to let the child live—

"Q. You'll have to speak up. I can't hear you.

"A. No, I didn't give the child to him. He came to me and asked me to let the baby live with him for awhile."

About a year after the baby was brought to Cleveland by relator's brother, the following writing was delivered to him:

"Leola Gary

"The mother of Charles Alfred Gary. Native home born in the State of Alabama, Lowndes County, Gardenville. Age 30—birth 10/24/27.

"I hereby according to law adopt this child Charles Alfred Gary to my brother, Andy Gary."

This paper, while written by the relator, is not subscribed by her.

There was at least an apparent attempt made to adopt the child by the Uncle, Andy Gary (before his death) and his wife (the respondent), but the effort failed because of the poor health of Andy Gary. This effort is understandable because of the fact that Andy Gary, a post office employee, and his wife, then beyond the age where parenthood could be anticipated, were childless as shown by the record. Andy Gary died at Crile Hospital of Hodgkin's disease. After his death, the relator came to Cleveland and demanded possession of her child, which demand was refused. This action was then commenced.

From the granting of the writ as prayed for, the appellant-respondent alleges the following errors:

"1. The Court erred in not considering the welfare of the child.

"2. The Court erred in not considering that the mother had abandoned the child.

"3. The Court erred in overruling defendant's motion for a direct finding.

"4. The Court erred in overruling defendant on certain objections made by defendant in respect to certain testimony.

"5. The verdict of the Court is against the weight of the evidence and is contrary to law.

"6. For errors of law appearing in the trial to which objections were made by the defendant at the time.

"7. For other errors of law appearing during the process of the trial and apparent on the face of the record."

There is no dispute but that Charles Alfred Gary is the child of the relator. There seems to be no doubt but that he was born out of lawful wedlock as is also true as to one or two of her other children. The principal basis upon which the appellant seeks to reverse the judgment of the trial court is that the interest of the child would be best served by permitting him to remain with the respondent.

The evidence rather sharply contrasts the difference between what the home of the mother has to offer in modern conveniences and that of the home of the respondent. The respondent, now a widow, bearing no relationship to the child, who, for that reason, owes no enforceable legal duty of care or support to the child, owns a nine room house with all city conveniences on East 109th Street in the City of Cleveland. The child is there provided with a separate bedroom, is afforded the facilities of the house and good and wholesome care, including all medical

services when needed. The respondent has an income from pensions, house rent and her services as a seamstress of about three hundred dollars a month.

On the other hand, the relator lives on a farm in Alabama said to consist of four rooms (the respondent testified there were five rooms, three of which are used as bedrooms), the house being occupied by relator's father and mother, her uncle and her children, five in number, including the child whose custody is here involved, ranging in age from eleven years to seventeen months. There are no modern facilities and the sleeping accommodations are admittedly somewhat crowded. The relator's income is entirely derived from the farm. There is, however, no evidence that even suggests that she is an improper person to have custody of her own children or is incapable of providing for their needs.

This court is not called upon to decide the issues here presented in the first instance. The trial court, after observing the witness upon the trial of the case, was afforded the opportunity to judge the ability of the relator to carry out her motherly duty under all of the surrounding circumstances. The mother of a bastard child is its natural guardian and as such, has the legal right to its custody and can be held legally and criminally responsible for its care and support. In **Vol. 7, O. Jur. 2d, page 472, paragraph 43,** the following appears:

"A mother is the natural guardian of her bastard child, and as such has the legal right to its custody, care, and control, superior to the right of the father or of any other person. The policy underlying this rule is quite patent, since there is usually doubt as to the identity of the father of a bastard child, but there can be no doubt as to the identity of the mother. The obligation to care for and maintain the bastard child is primarily imposed upon the mother; it therefore seems natural that she should have custody, to enable her adequately to discharge her obligation. The natural love and affection of the mother for the bastard child is normally greater than that of anyone else, so that the best interests of the child will generally be subserved by allowing it to remain in its mother's custody. The presumption is that its best interests require it to be in the mother's custody. Therefore, the burden is upon the person disputing the mother's custody to show why the general rule should not apply."

See Vol. 7, Am. Jur., page 668, paragraph 61, which completely supports the rule as thus stated which rule is supported by the great weight of authority. See also **Vol. 30, O. Jur. page 555, paragraph 10.**

While it is true that the child's physical comfort might be cared for on what we might call a more complete standard in Cleveland, there is nothing in the record to show that its care under the custody of its mother will be below the standards of the community in which she lives and that such life will be in the least detrimental to its health or proper up-bringing. At least, in Alabama the child will be afforded the privilege of growing up in his family circle and in the company of his brothers and not as the only child in the home of a middle aged widow who bears no relation to him whatever and whose circumstances could easily change so that his bringing up might become a bur-

den which she cannot be legally compelled to assume. Nor is there any suggestion that being a lonesome child on the streets of a big city will be more likely to his benefit than his growing up with the members of his family on a farm in Alabama.

In all events, unless it is shown that she is not a proper person, the rights of the mother must be given due consideration. She might well have agreed to let her brother have the custody of the child and even consented to its adoption by him. But all of the purposes behind bringing the child to Cleveland ended upon his death and the mother is not now to be charged with the abandonment or any other lack of interest in the child's welfare or to have been guilty of any conduct, under the facts of the case, that now would mitigate against her present right to the custody of her child. Farm hands do not have the ability to take long and frequent trips to visit members of the family and failure to do so is no evidence of lack of interest or the absence of love and affection for one's child.

We certainly cannot say that the judgment of the trial court was contrary to law or against the weight of the evidence.

The judgment is, therefore, affirmed.

KOVACHY, J, concurs.
HURD, PJ, dissents.

## DISSENTING OPINION

By HURD, PJ.

Certain significant facts are omitted from the majority opinion which I think must be emphasized in this dissenting opinion.

The record shows that the child was delivered to relator's brother and his wife, Louie E. Gary, respondent herein, when the child was six weeks old. The child was so ill at that time that the respondent had to stop on the way home to see a physician. It was found that the child was suffering from a virulent disease known as thrush, a severe infection of the mouth, and, in this case, the disease had penetrated through the child's entire body. In addition, the pediatrician employed by the respondent here found that the child was suffering from a rupture. The record shows that the respondent employed the pediatrician to care for the child and that she expended considerable sums of money in nursing the child back to a fair degree of health. The record of the pediatrician and bill for services are shown in the bill of exceptions. It is undisputed that during the time the child has been in respondent's custody, it has received the best of care and attention. It is also undisputed that the respondent is a woman of good character and reputation and of high moral standards.

When the present action was brought in the Court of Common Pleas, the child was two years and ten months old and is now approximately three and one-half years of age. Up to the time the action was brought, the relator had failed to see or visit her child and during that time failed to contact or even attempt to contact said child. She did not send the child any correspondence on holidays or on the child's birthday. There is no dispute as to the fact that she attempted to have the child

adopted by her brother and his wife. Certainly it must be considered that she knew that a child of tender years, six weeks of age at the time, would necessarily have the care and attention of the respondent, the wife of plaintiff's brother. There is no question either that the abortive attempt by the plaintiff to have the child adopted by her brother and his wife was due entirely to the illness of her brother who has since passed away. This good care and attention was lavished upon the child primarily by the respondent, Louie Gary.

It is the purpose of the relator, as shown by the record, to have the child returned to her home in Alabama which consists of only four rooms, occupied by the plaintiff, four other children of hers, as well as plaintiff's mother, father and uncle. In other words, there are eight people, three of whom are adults, plus five children, now occupying the four rooms on a farm in Lowndes County, Hayneville, Alabama.

As contrasted to the foregoing situation, the child is presently in the custody of the respondent who resides at 489 East 106th Street, Cleveland, Ohio, in a nine room home in which the child has its own room; that the respondent has an income of approximately $300.00 per month, is a seamstress by trade with appropriate accommodations for said trade in her home, and is, therefore, in a position to stay at home and make a living for and thus give her personal attention to the child. In addition, the child, if it continues to remain in Cleveland, has the benefit of superior educational advantages through our public schools and other advantages which it could not possibly have in Hayneville, Alabama.

Even the brother of the relator testified in favor of the respondent to the effect that the child is receiving the best of care and attention in the Cleveland home. On the contrary, the evidence shows that the relator, because of the overcrowded conditions above described, and because of inadequate facilities in the home in Alabama, is unable to give the child the attention and care which it should have.

The record also shows that the defendant had taken out an endowment policy for the future education of the child and hospitalization insurance for him, all of which indicates a sincere and loving interest in the welfare of the child.

So far as character is concerned, the record shows that the plaintiff is not of good moral character, being the mother of three illegitimate children, including the child which is the subject of the proceeding in this case.

The majority opinion speaks of the respondent as a middle aged widow. While she is a widow, certainly it is not a fact that she is middle aged, unless it is considered that she, being forty-two years of age at the time the child was placed in her care, was of such an advanced age as to prevent her from giving the child the care and attention which he deserves and is presently receiving at her hands.

In my opinion, the court committed prejudicial error, even to the extent of an abuse of discretion, in not considering as paramount the welfare of the child and in failing to take into consideration the fact that the mother had abandoned the child.

In the instant case, the child was not illegally or unlawfully detained

but was, in fact, in the custody and care of the defendant by virtue of plaintiff's own act in attempting to have her brother and his wife, respondent herein, adopt said child. By so doing and by failing to take any further interest in the child until such time as her brother passed away, she effectually abandoned said child to all intents and purposes and cannot now be heard to say that the child is presently being illegally or unlawfully detained by the defendant.

In view of the fact that the child now has a good home in a very fine environment where adequate school facilities are available, the best interests of the child will be served by permitting the child to remain in Cleveland where it will receive the best care and attention in the custody of the respondent. It is unthinkable that the best interests of the child will be served by requiring the child to be taken to a home in Alabama which is already overcrowded and which lacks proper facilities for the health, welfare, and education of the child.

The fundamental rule in actions in Habeas Corpus concerning the custody of a child is that the court shall consider as paramount the best interests of the child and the conditions and circumstances which will affect its future welfare. The welfare of the child is the primary question or the determining factor and all other matters must yield accordingly, including the comity existing between states. The child's welfare is paramount to the naked legal right of either parent and if the child's welfare so requires, the court will award custody to one other than the parent having the bare legal right to the custody of the child. See **26 O. Jur. 2d, Sec. 33, page 591, Habeas Corpus,** and cases therein cited, some of which are as follows: **Gishwiler v. Dodez, 4 Oh St 615; Elwood v. Elwood (App.), 3 Abs 213** and State, ex rel. Wilson v. Stiles, 12 O. D. N. P. 338, wherein it was held, in a child custody case, that the court will not order a change of custody unless it is satisfied that the child will not suffer thereby.

**In Re Tilton, 161 Oh St 571,** a case directly in point, the Supreme Court states, as appears by syllabus one, the following:

"1. Where an unwed mother immediately after the birth of a child surrenders possession of the child to blood relatives and thereafter her conduct with respect to said child is such as to amount to abandonment of the child, such mother cannot after a period of approximately seven years regain possession of such child through a habeas corpus proceeding instituted against the relatives to whom possession of the child was so relinquished, where in the judgment of the trial court it will serve the child's best welfare for the child to remain in the possession of those relatives."

See also In the Matter of JoAnn Justice, 135 N. E. 2d 285 (Ohio), wherein the following is set forth in headnote ten:

"10. A court is not bound to deliver a child to a parent upon the claim of mere legal right of a parent, but should in exercise of a sound consideration leave it where welfare of the child at the time appears to require."

In the recent case of **In re Fore, 168 Oh St 363, 367, 155 N. E. 2d 194,** Bell, J., speaking for the court, said, inter alia:

"Custody proceedings do not have as their purpose creation or recognition of an aggregate of legal relations, but rather a judicial determination of conflicting claims to the physical control and care of the child. These claims would normally be incidents of the parent-child relationship, and under ordinary circumstances there would be no occasion at all for their assertion in court. It is when the circumstances become abnormal, as where the parents are separated, or there is a divorce, or the parents are **allegedly unfit,** or are dead, that a situation for judicial cognizance arises. If the case were merely one for determining the merits of the conflicting claims as between the immediate parties, there would be no particular reason for departing from usual concepts of jurisdiction in personam; **but the very abnormality of the situation brings into play the further idea that in making his decision, the trial judge should be guided not so much by legalistic formulae as by considerations which have a bearing upon the ultimate interests of the child.**" (Emphasis added.)

In headnote one, in the same case, as set forth in 155 N. E. 2d 194, the thought expressed by the court is condensed as follows:

"1. Award of custody of minor is not simply an adjudication of personal rights of individuals in and to the minor, but is a conclusion of what is best for the welfare of the minor."

While the Fore case, supra, involved questions of domicile, nevertheless what is best for the welfare of the child is the principle which was enunciated in that case which should likewise be applied to the instant case. There can be no doubt, upon comparison of the environment of the child here present in the City of Cleveland, as compared to that existing in Alabama, that the paramount interests of the child are best served by remaining in the custody of the respondent.

The citation contained in the majority opinion of **Vol. 7, O. Jur. 2d, page 472, paragraph 43,** supports this dissenting opinion if the entire paragraph is considered. In the same section, Paragraph 43, at page 473, the following appears:

"However, although the mother has the superior legal right to custody, yet, in proceedings to determine custody, her legal right is not absolute, attention being paid to the welfare of the illegitimate child· and its custody will be placed elsewhere when the mother's continued custody would be likely to cause injury to the child, **as where her conduct is unchaste or impure,** or she ill-treats, **abandons,** or **fails to support the child.** Also, the right of the mother of an illegitimate child to its custody may be relinquised by **Contract, forfeited by abandonment** (which is the case here) **or lost by her being in a condition of total inability to afford it necessary care and support.**" (Emphasis added.)

The essential facts in this case being undisputed, a question of law only is presented by reason of which the judgment should be reversed as being prejudicial and not in the best interests of the minor child and final judgment should be rendered for the respondent, or in the alternative, the cause should be remanded to the Court of Common Pleas with instructions to deny the writ of Habeas Corpus.